IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| LISA A. HEMPHILL, | : | CIVIL ACTION |
| --- | --- | --- |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CITY OF WILMINGTON, et al., | : | NO. 10-679 |
| Defendants. | : | |

## MEMORANDUM OPINION

Plaintiff Lisa A. Hemphill sued her employer, the City of Wilmington ("the City"), alleging two violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq. Both of Hemphill's claims arise from racial harassment she allegedly experienced between October 2007 and January 2008. See generally Compl., Hemphill v. Wilmington, No. 10-679 (D. Del. Aug. 12, 2010) [hereinafter Compl.].[1] The City seeks summary judgment. See Defs.' Mot. Summ. J., Hemphill v. Wilmington, No. 10-679 (D. Del. May 5, 2011); Defs.' Opening Br. Supp. Mot. Summ. J. at 1-2, 9-17, Hemphill v. Wilmington, No. 10-679 (D. Del. May 5, 2011) [hereinafter Defs.' Br.]. For the reasons that follow, the City's motion is granted as to Hemphill's hostile work environment claim, but denied as to her retaliation claim.

Even assuming Hemphill's subordinates created a racially hostile work environment, no reasonable jury could conclude the City was liable for the conduct. The evidence establishes the City promptly addressed Hemphill's complaint and the alleged unlawful conduct ceased.

---

[1] Although Hemphill also names the Mayor and Council of the City of Wilmington as defendants, she does not describe them as parties in the body of the Complaint, see Compl. at ¶¶ 1-2, nor does she make any factual allegations involving them, see id. at ¶¶ 7-39. For purposes of this Memorandum Opinion, references to the City are intended to encompass all three named defendants.

However, Hemphill has raised a genuine factual dispute -- albeit a weak one -- as to whether she was subject to an adverse employment action after raising a hostile work environment complaint with her superior. Her retaliation claim will proceed to trial.

**I. BACKGROUND**[2]

Beginning in April 2004, Hemphill was employed by the City as an administrative assistant to the Chief of Police, a "non-merit" or "appointed" position. Compl. at ¶¶ 13, 35; Defs.' Br. at Ex. A. On October 22, 2007, Hemphill was selected to fill a new role, Constituent Services Supervisor ("CSS"), which was a "merit" or "non-union" position. Compl. at ¶¶ 14-15, 33; Defs.' Br. at Ex. A. With the new job came greater job security and a salary increase of more than $2,000 per year. See App. to Pl.'s Answering Br. Opp'n Defs.' Mot. Summ. J. at B182, Hemphill v. Wilmington, No. 10-679 (D. Del. May 24, 2011) [hereinafter Pl.'s App.]; compare Defs.' Br. at Ex. A (new salary of $44,017), with id. at Ex. T (old salary of $41,848.42). Hemphill's first ninety days in her new position were considered a probationary period. See Compl. at ¶ 15; cf. Defs.' Br. at 7.

In her new supervisory capacity, Hemphill was tasked with overseeing daily operations in the Call Center at the Department of Public Works, where four Constituent Services Assistants ("CSAs") responded to telephone calls from local residents. See Pl.'s App. at B059; Defs.' Br. at 3. One of the CSAs, Sharlene Drummond, had also applied for the CSS position. See Defs.' Br. at Ex. C.

All four CSAs are African-American women; Hemphill is white. See id. at Ex. B.

---

[2] For purposes of the City's motion, I have viewed all facts in the light most favorable to Hemphill. See Ray v. Warren, 626 F.3d 170, 173 (3d Cir. 2010).

Hemphill was warned she might meet resistance from the CSAs, who had been largely unsupervised for many years. See id. at Exs. B, G; Pl.'s App. at B072. The warnings proved accurate almost immediately. Two of the four CSAs turned their backs on Hemphill during her first meeting with them. See Pl.'s App. at B134-35. That meeting launched a series of conflicts between Hemphill and the two CSAs, Drummond and Tracey Husser.

On October 29, 2007, her first full day working in the Call Center, Hemphill claims Drummond announced she was "seething with anger" because Hemphill received the CSS position, which Drummond said she deserved. See id. at B189-90. Drummond further speculated the job might have been given to Hemphill "because [she is] white." Id. at B190. Meanwhile, during her first two weeks as CSS, Hemphill issued four disciplinary write-ups: two to Drummond and two to Husser, primarily for failure to follow the proper procedure when calling out sick. See Defs.' Br. at Ex. D.

In mid-November 2007, Hemphill entered the Call Center and heard Drummond loudly comment, "Jena 6, that's all I'm saying, Jena 6."[3] See Pl.'s App. at B193. Although she admits Drummond was speaking to another CSA, Hemphill believes the comment was "geared toward" her. Id. at B193-94. When Hemphill confronted Drummond about the comment and explained it could be perceived as harassing or intimidating, Drummond did not recall making the statement but said it may have been part of a discussion of current events. See Defs.' Reply Br. Supp. Mot.

---

[3] "Jena 6" refers to a group of six African-American teenagers from Jena, Louisiana, who were arrested and faced criminal charges for beating a white classmate. The incident sparked civil rights demonstrations in September 2007 based on perceptions that the teens' race played a role in the decision to charge them criminally, and because three white students had not faced criminal charges when they hung nooses from trees outside a Jena high school a few months earlier. See generally "Protesters March in Support of Jena Six," Nat'l Public Radio (Sept. 20, 2007), http://www.npr.org/templates/story/story.php?storyId=14556993 (last visited Aug. 3, 2011).

Summ. J. at Ex. A, Hemphill v. Wilmington, No. 10-679 (D. Del. June 1, 2011) [hereinafter Defs.' Reply]; Pl.'s App. at B058. Drummond reiterated her position in an E-mail to Hemphill, also noting "a pattern of harassment and intimidation by [Hemphill] towards [Drummond]." Pl.'s App. at B058.

Thereafter, Drummond and Husser met with someone in the Personnel Department and alleged Hemphill was using her supervisory position to harass them. See Defs.' Br. at Ex. M; Pl.'s App. at B051. Additionally, Kash Srinivasan, the Commissioner of Public Works, met with Hemphill, the CSAs, and Alfonso Ballard (the Director of Operations and Hemphill's immediate supervisor) to address the tension within the Call Center. See Defs.' Br. at Ex. D; Pl.'s App. at B029. During that meeting, Drummond alleged Hemphill treated the CSAs like children despite the fact they were "four mature black women." Defs.' Br. at Ex. G.

On November 21, 2007, Hemphill learned Srinivasan had not approved the disciplinary write-ups she had issued to Drummond and Husser.[4] See id. at Ex. H. In a November 27, 2007 memorandum to Ballard, Hemphill documented her concerns about her ability to effectively supervise the CSAs if her own superiors did not support her efforts to establish her authority. Id.

Two days later, Hemphill met with the CSAs to inform them of a shift change she intended to implement, upsetting Husser, whose ability to work a second job would be impacted. See id. at Ex. I. After the meeting, Hemphill noticed Drummond's attitude toward her

---

[4] One of Drummond's write-ups related to her failure to speak directly to Hemphill when calling out sick on November 8, 2007. See Defs.' Br. at Ex. D. However, Drummond explained she did contact the Call Center that morning and informed Husser she was going to the emergency room due to chest pains, and Hemphill admits Drummond's husband called her later that day from the hospital to explain Drummond's condition. See id.; Pl.'s App. at B054, B191.

deteriorating, with Drummond ignoring her and using earphones to listen to music. Id. That afternoon, Hemphill overheard Drummond outside the Call Center saying, "someone needs to punch that bitch in the face." Id. Believing Drummond was referring to her, Hemphill notified Ballard in a November 30, 2007 memorandum that she "ha[d] begun to fear for [her] personal safety," citing a "hostile environment in the Call Center" based on the behavior of Drummond and Husser. Id. She did not allege any racially-motivated issues. Hemphill also filed a police report on December 4, 2007, alleging Drummond was harassing her and describing the "punch in the face" comment, as well as the "seething with anger" comment from Hemphill's first day at the Call Center. See id. at Ex. K. The police report, like both of Hemphill's memoranda to Ballard, contained no reference to any race-related comments by Drummond. See id. at Exs. H, I, K.

On December 5, 2007, Ballard notified Hemphill that, based on her safety concerns, she was to report to a different office while the Personnel Department conducted an investigation. See id. at Ex. L. Hemphill protested her temporary removal from the Call Center, but complied with Ballard's directive when she returned from sick leave on December 10, 2007. See id. at Exs. J, M, N. In December 2007 and early January 2008, Samuel Pratcher, Deputy Director of Personnel, conducted interviews and collected written accounts from Hemphill, Drummond, Husser, and six other employees regarding Hemphill's complaint.[5] See, e.g., Pl.'s App. at B052-56, B099; Defs.' Br. at Ex. J. In her written responses to Pratcher's interview questions, Hemphill explicitly identified Drummond's "Jena 6" and "maybe because you're white"

---

[5] Also in December, Tom McLaughlin, Deputy Commissioner of Public Works, investigated Drummond's harassment complaint against Hemphill, concluded it was unfounded, but recommended conflict resolution and team building assistance for the Constituent Services employees. See Defs.' Br. at Ex. F.

comments as elements of her complaint, which the City treated as an allegation of hostile work environment. See Defs.' Br. at Ex. J; Pl.'s App. at B052.

Pratcher issued a preliminary report on January 4, 2008, making the following interim recommendations: Hemphill should be permitted to return to the Call Center; Srinivasan should speak with the CSAs about showing Hemphill respect; Hemphill should attend supervisory training; and future disputes should be discussed directly with Srinivasan or McLaughlin. See Defs.' Br. at Ex. Q.

Based on that report, Srinivasan met with Hemphill on January 9, 2008 to discuss implementing Pratcher's recommendations and extending Hemphill's probationary period to better assess her supervisory skills. See id. at Ex. R.[6] Srinivasan said the extension was "not a punitive thing," but told Hemphill he "would have to say she didn't work out" if he were "pressed today" to make a decision. Id. Hemphill, however, objected to the extension of her probationary period and expressed continuing reluctance to return to the Call Center, stating she "can't just go back down there unless something changes with [Drummond] and her attitude and her open hostility . . . ." Id. As a result, Srinivasan placed her return "on hold" so he could consider how to proceed. Id. He noted he was "faced now with determining what happens with [Hemphill] regarding [her] current condition of employment," referencing the end of her probationary period on January 22, 2008. Id.

---

[6]Hemphill secretly recorded the January 9, 2008 meeting without the consent of the other participants and in apparent violation of Delaware's privacy laws. See Del. Code Ann. tit. 11, § 1335(a)(4). The transcript provided by the parties was prepared by Hemphill, summarizes several omitted portions of the conversation, and is peppered with partisan commentary and characterizations. See generally Defs.' Br. at Ex. R. Any marginal relevance is substantially outweighed by the risk of jury confusion and unfair prejudice. See Fed. R. Evid. 403. As such, it would be inadmissible at trial. Id.

Srinivasan documented the meeting in a memorandum written the same day, noting Hemphill had said she was not prepared to return to the Call Center, and explaining she had "reassigned herself" to work for the Police Chief since being removed from the Call Center in December. See Pl's App. at B080-81. The next day, Hemphill notified the Director of Personnel, Monica Gonzalez-Gillespie ("Gillespie"), about the meeting with Srinivasan, characterizing it as "an unfair attempt . . . to force my withdrawal from the position of [CSS]." See id. at B120. Also on January 10, 2008, Pratcher wrote to Srinivasan to outline the steps Hemphill would need to take if she wished to pursue a "voluntary demotion" back to her position as an administrative assistant to the Chief of Police. See id. at B121. To his letter, Pratcher attached a provision from the City's Personnel Code providing:

> Any regular employee who does not satisfactorily complete the probationary period in a position to which [she] has been promoted shall have the right to return to the position from which [she] was promoted, unless the employee is discharged for just cause, including inability to perform the functions of the job, due to circumstances that would have called for the employee's discharge from the regular position as well.

Pl.'s App. at B122-23 (containing Wilmington City Code § 40-152).

On January 14, 2008, Pratcher notified Hemphill he had concluded his investigation into her complaint about Drummond and deemed her allegations unsubstantiated.[7] See Defs.' Br. at Ex. U. The same day, Hemphill met with Gillespie and Srinivasan, and Gillespie rejected Hemphill's characterization of her meeting with Srinivasan. See Pl.'s App. at B029, B200. According to Hemphill, Gillespie "strongly suggested" she seek permission to return to her previous position with the Police Chief. See id. at B029. Specifically, Hemphill testified

---

[7]Hemphill did not receive Pratcher's letter until January 22, 2008. See Pl.'s App. at B029.

Gillespie showed her the Personnel Code provision excerpted above and "strongly suggest[ed] that [she] refer to that section." See Pls.' App. at B200; Hemphill Dep. at 71 [hereinafter Court Ex.1].[8] Hemphill understood Gillespie "to mean she felt that [Hemphill] should request to go back to [her] former position, because if [she] didn't, [she] wouldn't have a job." Court Ex. 1.

After the meeting, Hemphill submitted a written request to return to her former position with the Chief of Police. See Defs.' Br. at Ex. T (referring to Hemphill's Jan. 14, 2008 request). Her request was approved. Id.

Pratcher issued a final report disposing of Hemphill's hostile work environment complaint on February 28, 2008. See Pl.'s App. at B052-56. On March 25, 2008, Hemphill filed a complaint with the Delaware Department of Labor ("DDOL") alleging retaliation, constructive discharge, and race-based harassment.[9] See Defs.' Br. at Ex. B. The DDOL issued a no-cause determination and right-to-sue notice on June 30, 2009. Pl.'s App. at B033.

## II.    DISCUSSION

### A.    Summary Judgment Standard

---

[8]Neither party provided pages 71 and 72 of Hemphill's deposition as an exhibit. Hemphill provided page 70, which ends mid-sentence as follows: "[Gillespie] referred me to a section of the city code -- off the top of my head, I don't know what the number is. She just said, I suggest that you . . . ." Pl.'s App. at B200. As discussed in Section II.C, infra, the remainder of Hemphill's answer, which continues onto page 71 of her deposition, contains information critical to an assessment of her retaliation claim. At my request, counsel for the City supplied the missing pages, which are appended to this Memorandum Opinion as Court Exhibit 1. See Fed. R. Civ. P. 56(e)(4).

[9]On January 28, 2008, Drummond and Husser also filed charges of discrimination against the City, based in part on the disciplinary write-ups issued to them by Hemphill. See Pl.'s App. at B066, B071.

Entry of summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). I must "view the facts and draw inferences in the light most favorable to the nonmoving party." Ray, 626 F.3d at 173. A genuine dispute as to a material fact exists when "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) (citations omitted).

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (footnote and citations omitted); see also Wellman v. DuPont Dow Elastomers, L.L.C., 739 F. Supp. 2d 665 (D. Del. 2010) ("The mere existence of some evidence in support of the nonmoving party . . . will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue.").

Applying these standards to the record before me, the City is entitled to judgment as a matter of law only with respect to Hemphill's hostile work environment claim.

**B.     Count I -- Hostile Work Environment**

Hemphill first alleges the actions of Drummond and Husser created a hostile work environment, constituting discrimination on the basis of race in violation of Title VII. See Compl. at Count I. However, she has not adduced evidence from which a reasonable jury could hold the City liable for the actions of its employees, who were Hemphill's subordinates. Such evidence would be necessary to defeat the City's motion for summary judgment with respect to Count I.

"Title VII is not 'a general civility code for the American workplace.'" Jensen v. Potter, 435 F.3d 444, 449 n.3 (3d Cir. 2006), overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006) (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80-81 (1998)). Although it prohibits racial harassment resulting in a hostile work environment, Title VII "does not mandate a happy workplace." Id. at 451. A race-based hostile work environment exists "when unwelcome [racial] conduct unreasonably interferes with a person's performance or creates an intimidating, hostile, or offensive working environment." See Weston v. Pennsylvania, 251 F.3d 420, 425-26 (3d Cir. 2001) (citing Meritor Sav. Bank FSB v. Vinson, 477 U.S. 57, 65-67 (1986)).

To establish a prima facie hostile work environment case against the City, Hemphill must prove: (1) she suffered intentional discrimination because of her race; (2) the discrimination was severe or pervasive;[10] (3) she was detrimentally affected by the discrimination; (4) the discrimination would detrimentally affect a reasonable person in her position; and (5) respondeat

---

[10] Although the United States Court of Appeals for the Third Circuit originally termed this element "pervasive and regular," see Andrews v. Phila., 895 F.2d 1469, 1482 (3d Cir. 1990), it has since conformed its standard with the United States Supreme Court's "severe or pervasive" requirement. See Jensen, 435 F.3d at 449 n.3.

superior liability exists. Andrews, 895 F.2d at 1482; see also Cardenas v. Massey, 269 F.3d 251, 260 (3d Cir. 2001); accord Weston, 251 F.3d at 426.

Of particular importance here is the fifth element. Where the hostile work environment is allegedly created by a plaintiff's co-workers or subordinates, the "employer is not always liable." Kunin v. Sears Roebuck & Co., 175 F.3d 289, 293 (3d Cir. 1999). "Even if a work environment is . . . hostile, a plaintiff must also show that the conduct creating the hostile work environment should be imputed to the employer." Knabe v. Boury Corp., 114 F.3d 407, 410 (3d Cir. 1997). Employer liability exists only if the plaintiff demonstrates "the employer failed to provide a reasonable avenue for complaint, or, if the employer was aware of the alleged harassment, that it failed to take appropriate remedial action." Weston, 251 F.3d at 427; see Andrews, 895 F.2d at 1486 (a plaintiff must prove "management-level employees had actual or constructive knowledge about the existence of a [racially] hostile work environment and failed to take prompt and adequate remedial action"); see also Huston v. Procter & Gamble Paper Prods. Corp., 568 F.3d 100, 104-05 (3d Cir. 2009); Knabe, 114 F.3d at 411.

As to notice, "when employees' complaints do not refer to [racially] offensive behavior, employers are not on constructive notice of [racial] harassment." Kunin, 175 F.3d at 294; see Huston, 568 F.3d at 105. Further, an employer's remedial action is appropriate "if it is reasonably calculated to prevent further harassment." Knabe, 114 F.3d at 411 n.8; see Andreoli v. Gates, 482 F.3d 641, 644 (3d Cir. 2007). "[W]hen an employer's response stops the harassment, there can be no employer liability under Title VII." Weston, 251 F.3d at 427; see Knabe, 114 F.3d at 411 n.8 ("A remedial action that effectively stops the harassment will be deemed adequate as a matter of law."); Kunin, 175 F.3d at 294.

Hemphill acknowledges the City had a written "Harassment-Free Work Environment" policy, Defs.' Br. at Ex. V, providing "a reasonable avenue for complaint," Weston, 251 F.3d at 427. See Pl.'s Answering Br. Opp'n Defs.' Mot. Summ. J. at 19-20, Hemphill v. Wilmington, No. 10-679 (D. Del. May 24, 2011) [hereinafter Pl.'s Br.] (noting the policy, but challenging the adequacy of the City's investigation of Hemphill's complaint). Therefore, to hold the City liable, Hemphill must show it "was aware of the alleged harassment, [and] that it failed to take appropriate remedial action." Weston, 251 F.3d at 427. The record reveals Hemphill first notified the City she believed the environment in the Call Center was hostile in her November 30, 2007 memorandum to her supervisor, Ballard.[11] See Defs.' Br. at Exs. G, I. The racial nature of her complaint was not explicit in the memorandum, but it became apparent to the City's management-level employees during the course of their investigation. See Defs.' Br. at Ex. J (Hemphill included the "Jena 6" and "maybe because you're white" comments in written responses to the Deputy Director of Personnel's investigation questions on Jan. 2, 2008); see also id. at Ex. F (the Deputy Commissioner of Public Works learned of the "Jena 6" and "four mature black women" comments while investigating Drummond's complaint against Hemphill on Dec. 17, 2007). Thus, a jury could find the City was on notice of the racial underpinnings of

---

[11]In her deposition, Hemphill testified she talked to Ballard about her difficulties with Drummond and Husser as they arose, but admitted she chose not to pursue a formal complaint in the hopes the tension would resolve. See Defs.' Br. at Ex. G; see also Pl.'s App. at B136 (Ballard knew Hemphill's relationship with Drummond and Husser "did not appear to be going too well," and he discussed with her ways to improve it); cf. Pl.'s App. at B274 (Hemphill's mentor knew she was met with "pushback," "resistance," and "attitudes," but mentioned no racial problems). Hemphill eventually chose to document her concerns on November 30, 2007, so that the Personnel Department would get involved and "something would happen." Defs.' Br. at Ex. G.

Hemphill's hostile work environment complaint in December 2007 or early January 2008. Id. at Exs. F, J.

Although Hemphill has adduced evidence showing notice, she has failed to raise a genuine factual dispute as to whether the City took prompt and adequate remedial action. Immediately upon receipt of Hemphill's November 30, 2007 memorandum, Pratcher temporarily removed Hemphill from the allegedly hostile environment and initiated an investigation. See Pl.'s App. at B097 (showing Pratcher received the memorandum on December 5, 2007); Defs.' Br. at Ex. L (informing Hemphill an investigation would be conducted and ordering her to report to a different office starting December 6, 2007 to ensure her safety). Hemphill identifies no further incidents -- racial or otherwise -- to suggest she was exposed to a hostile work environment after she was removed from the Call Center. She does not claim Drummond continued to harass her, nor does she cite any instances of racial discrimination by other city employees while the investigation of her complaint was pending.[12]

Hemphill insists the City could have better addressed her concerns, identifying various deficiencies she perceived in its response to her complaint. See Pl.'s Br. at 7-12, 16, 18-20. However, "[t]he question . . . is not whether the investigation was adequate . . . but rather whether the remedial action was adequate." Knabe, 114 F.3d at 412. In response to Hemphill's complaint that two of the four CSAs she supervised said and did things that not only created a

---

[12]Hemphill finds fault with Pratcher's decision to remove her from the Call Center, while allowing Drummond and Husser -- the "harassers" -- to remain there. See Pl.'s Br. at 6-7. She cites to Ballard's deposition to support her contention that Pratcher's decision "went against normal protocol" and was racially motivated. Id. at 7; see Pl.'s App. at B175. However, Pratcher explained moving Hemphill was least disruptive to the daily operation of the Call Center. Pl.'s App. at B052; see Defs.' Br. at Ex. I (complaining about two of the four CSAs). Ballard's opinion alone would not support a finding that Pratcher's removal of Hemphill was racially motivated, and there is no other evidence in the record to support such a finding.

hostile work environment, but caused Hemphill to fear for her own safety, see Defs.' Br. at Ex. I, the City moved Hemphill to a different work area and investigated the alleged violators. See Cerros v. Steel Techs., Inc., 398 F.3d 944, 954 (7th Cir. 2005) (prompt investigation is "a hallmark of reasonable corrective action"). The City's remedial action was not only "reasonably calculated to prevent further harassment," it did, in fact, stop the harassment. Knabe, 114 F.3d at 411 n.8. Such remedial action is "adequate as a matter of law." Id.; see Skidmore v. Precision Printing & Packaging, Inc., 188 F.3d 606, 616 (5th Cir. 1999) (remedial action of moving plaintiff to a different shift was adequate where harassment stopped, even though plaintiff remained "uncomfortable," employer conducted no investigation until months later, and harasser was not reprimanded).

Moreover, Hemphill "has presented no evidence that there would have been a hostile work environment had she returned" to the Call Center. Knabe, 114 F.3d at 413. When offered an opportunity to return, Hemphill declined, despite assurances from Srinivasan that he would personally speak with each CSA to explain their duties and obligations, that Hemphill would be supported by McLaughlin as she resumed her duties, and that she would be given additional time to acclimate to her supervisory position.[13] See Defs.' Br. at Ex. R.

The record before me shows any harassment Hemphill suffered as CSS ceased when she was removed from the Call Center. Absent some non-speculative showing by Hemphill that such harassment continued after her removal, or would have continued had she returned to the Call Center, no reasonable jury could conclude the City's remedial action was inadequate. See

---

[13]Notwithstanding Hemphill's confidence in the merit of her complaint, Defs.' Br. at Ex. R, and perhaps her belief Drummond and Husser should have been disciplined for their behavior, "an employee cannot dictate that the employer select a certain remedial action." Knabe, 114 F.3d at 414.

Weston, 251 F.3d at 427. Under these circumstances, Hemphill has not demonstrated a genuine factual dispute regarding the City's respondeat superior liability, an element she must prove at trial.[14] See Andrews, 895 F.2d at 1482.

### C.  Count II -- Retaliation

In her second cause of action, Hemphill alleges the City retaliated against her in violation of Title VII by forcing her to resign from the CSS position and return to her "non-merit" position with the Chief of Police after she complained about Drummond and Husser. See Compl. at Count II. Hemphill has marshaled barely sufficient evidence to defeat summary judgment on her retaliation claim. The record contains at least some evidence from which a reasonable juror could conclude Hemphill's return to her position with the Chief of Police was not voluntary.

To establish a prima facie case of retaliation under Title VII, Hemphill must show: (1) she engaged in a protected activity; (2) the City took an adverse employment action after or contemporaneous with the protected activity; and (3) the protected activity and the adverse employment action were causally linked. See Moore v. Phila., 461 F.3d 331, 340-41 (3d Cir.

---

[14] Given my conclusion regarding the respondeat superior element, I need not address the other four elements of a hostile work environment claim. See Andrews, 895 F.2d at 1482. It is worth briefly noting, however, that Hemphill's proof of three of the remaining elements is weak, at best. The only element she plainly satisfies is the third -- her deposition testimony establishes she was detrimentally affected by the behavior of Drummond and Husser. However, it is far from clear that Hemphill suffered discrimination because she was white (and not because she was selected for a job Drummond wanted), that the discrimination was severe or pervasive (and not simply three isolated comments referencing race), and that the discrimination would have detrimentally affected a reasonable person in Hemphill's position. See Jensen, 435 F.3d at 452 (a "cold shoulder" or a "[m]ere expression of opinion" is not harassment); id. at 449 ("Many may suffer severe or pervasive harassment at work, but if the reason for that harassment is one that is not proscribed by Title VII, it follows that Title VII provides no relief."); Andrews, 895 F.2d at 1484 ("The objective standard protects the employer from the 'hypersensitive' employee . . . .").

-15-

2006); Weston, 251 F.3d at 430; see also Wellman v. DuPont Dow Elastomers, L.L.C., 414 F. App'x 386, 389 (3d Cir. 2011).

The City briefly questions whether Hemphill engaged in protected activity, suggesting she never tied her hostile work environment complaint to allegations of race-based harassment. See Defs.' Br. at 16. However, for the reasons already discussed, the record contains evidence suggesting Hemphill notified the City of the racial undertones to her hostile work environment complaint -- at the latest -- in her January 2, 2008 responses to Pratcher's investigation questions. See Defs.' Br. at Ex. J. Based on that evidence, a reasonable jury could find Hemphill engaged in protected activity before her transfer from the CSS position. See 42 U.S.C. § 2000e-3(a); Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1085 (3d Cir. 1996).

The central dispute here, and the focus of the parties' briefs, is the second element: adverse employment action.[15] See Defs.' Br. at 14-16; Pl.'s Br. at 17-19; Defs.' Reply at 8-10. It is undisputed that Hemphill was not fired or demoted by the City, but resumed her previous position after her written request to do so was granted. See Defs.' Br. at Ex. T; Pl.'s App. at B029. "Therefore, to show that her [transfer] was an adverse employment action taken by [the City], she ha[s] to show that she was forced to [transfer] or constructively discharged [from her CSS position] under circumstances that give rise to an inference of racial discrimination." Seeney v. Elwyn, Inc., 409 F. App'x 570, 573 (3d Cir. 2011). This is an objective standard. Id.; see Gray v. York Newspapers, Inc., 957 F.2d 1070, 1083 (3d Cir. 1992) ("[T]he law does not

---

[15]The City has not addressed the third element -- a causal link -- in its brief, limiting its focus to arguing Hemphill did not engage in protected activity and did not suffer an adverse employment action. See Defs.' Br. at 14-16. Because the City has not identified the "causal link" element of the retaliation claim as a basis for its motion, I need not consider it. See Fed. R. Civ. P. 56(a).

-16-

permit an employee's subjective perceptions to govern a claim of constructive discharge.") (quoting Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985)). "The analysis focuses on what a reasonable person would do if placed in the position the employee was in when she [requested transfer]." Seeney, 409 F. App'x at 573; see Clowes v. Allegheny Valley Hosp., 991 F.2d 1159, 1161 (3d Cir. 1993).

Hemphill contends she transferred back to her position with the Chief of Police involuntarily, after Srinivasan and Gillespie "strongly suggested" she do so and "suggested the possibility of a termination." Pl.'s Br. at 12, 18. She argues she was "[f]aced with a choice of an unsatisfactory probation, and being returned to a hostile environment," and she asserts she "was forced to choose the only avenue which [was] left open to her, reverting to her former non-merit position." Id. at 13. She bases her contention on the events that unfolded during her January 9, 2008 meeting with Srinivasan, and her January 14, 2008 meeting with Srinivasan and Gillespie. Hemphill left the first of these meetings believing Srinivasan had taken the ninety-day probation extension "off the table," meaning her "probationary period [was] about to expire in a matter of days." Court Ex. 1. She further believed, based on his statements in the meeting, Srinivasan had determined she "had not satisfactorily completed [her probation]." Pl.'s App. at B202.

Against this backdrop, only days later Gillespie "strongly suggested" that Hemphill refer to a City code provision permitting promoted employees to return to their previous positions. Court Ex. 1. Hemphill understood the code provision to mean she would not be permitted to return to her previous position if her probationary period were deemed unsuccessful. See id.

Based on Hemphill's accounts of these two meetings, a reasonable juror could conclude Hemphill reasonably perceived she was faced with a choice between requesting a transfer to her previous position with the Chief of Police and losing her job at the expiration of her probationary

period, which was rapidly approaching. A reasonable juror could conclude Hemphill objectively believed she faced a probationary term destined for failure and could be removed for cause if she did not perform to the City's satisfaction. Although Hemphill's understanding appears to conflict with the language of the City code provision Gillespie invoked, see Pl.'s App. at B122-23, it will be for the jury to decide whether her perception would have been shared by a reasonable person under the circumstances. See Stremple v. Nicholson, 289 F. App'x 571, 574 (3d Cir. 2008) ("Constructive discharge is a heavily fact-driven determination."); see also Seeney, 409 F. App'x at 573 (listing factors courts consider in determining whether a resignation was forced, including whether the employer encouraged the employee to resign); Clowes, 991 F.2d at 1161 (considering whether an employer urged or suggested resignation).

Because a material factual dispute exists regarding whether Hemphill was forced to transfer or constructively discharged from her supervisory position, the City is not entitled to summary judgment on Hemphill's retaliation claim.[16]

An appropriate order follows.

---

[16]The record strongly suggests Hemphill simply did not want to return to the Call Center unless the City ratified her complaint and disciplined Drummond and Husser. See Defs.' Br. at Ex. R; Pl.'s App. at B120; cf. Wellman, 739 F. Supp. 2d at 671 (retaliation claim refuted by evidence plaintiff refused to return to work except on her terms, even though employer offered assistance in finding other job opportunities within the company). A jury could easily conclude a reasonable person in Hemphill's position would have accepted Srinivasan's conditions and tried returning to the Call Center, sought additional conditions to better facilitate a return to the Call Center, or at least awaited notice of the outcome of Pratcher's investigation, before seeking a demotion. See Clowes, 991 F.2d at 1161 ("[A] reasonable employee will usually explore such alternative avenues thoroughly before coming to the conclusion that resignation is the only option."); see also Seeney, 409 F. App'x at 574 (no constructive discharge where employee did not wait to learn the outcome of her latest complaint against her supervisor and instead resigned, assuming she faced discipline and possible termination).