IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LISA A. HEMPHILL, | : | CIVIL ACTION |
|     Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CITY OF WILMINGTON, et al., | : | NO. 10-679 |
|     Defendants. | : | |

MEMORANDUM OPINION

TIMOTHY R. RICE                                                              December 20, 2011
U.S. MAGISTRATE JUDGE

      Plaintiff Lisa A. Hemphill seeks various forms of equitable relief in the wake of a jury's finding that her employer, the City of Wilmington ("the City"), retaliated against her in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq. The City objects to each of Hemphill's requests, arguing she is entitled to no relief at all, notwithstanding the jury verdict in her favor. Based on the remedial purpose underlying Title VII, I will grant Hemphill's motion.

I.     BACKGROUND[1]

      Beginning in 2004, Hemphill was an administrative assistant to the City's Chief of Police. That position was "appointed," meaning she served at the pleasure of the mayor and would not be guaranteed a job if a new mayor were elected. Wishing to continue her employment with the City, but hoping to transfer to a "merit" position that would outlast any changes in administration, Hemphill applied and was selected for a supervisory position in October 2007. Her new role -- Constituent Services Supervisor ("CSS") -- provided the job security she desired, as well as a salary increase. As CSS, Hemphill supervised daily operations

---

[1] The factual background is based on the trial evidence viewed in the light most favorable to Hemphill, as the verdict winner.

in the Call Center at the Department of Public Works, where four Constituent Services Assistants ("CSAs") responded to telephone calls from local residents.

In late 2007, all four CSAs were African-American women; Hemphill is white. Almost immediately, Hemphill was met with resistance from the CSAs, who had been largely unsupervised for many years. Hemphill's first month on the job was marked by a series of conflicts, with two CSAs in particular. Some of the conflicts involved comments by the CSAs that Hemphill perceived as racially offensive and intimidating.

In late November 2007, Hemphill sent a memorandum to her superiors documenting her concerns about the hostile atmosphere in the Call Center, and noting she feared for her safety. As a result, Hemphill was temporarily removed from the Call Center in early December 2007 while the Personnel Department investigated her allegations. While relocated, Hemphill had few, if any, daily job responsibilities.

In early January 2008, Hemphill met with Kash Srinivasan, the Commissioner of Public Works. Srinivasan told Hemphill she could return to the Call Center, and that he would speak with the CSAs about the need to show Hemphill respect, but that Hemphill would be required to attend supervisory training and complete an extended probationary period. Hemphill objected to the extension of her probation and expressed reluctance to return to the Call Center unless something was done to ensure the CSAs' behavior changed. Srinivasan refused to implement additional measures to assuage Hemphill's concerns, and instead said her return to the Call Center was "on hold."

The day after her meeting with Srinivasan, Hemphill notified the Director of Personnel, Monica Gonzalez-Gillespie, that she believed Srinivasan was attempting to force her to withdraw from her position as CSS. A few days later, Hemphill met with Gillespie and Srinivasan, and

Gillespie "strongly suggested" she seek permission, pursuant to a specific City Code provision, to return to her previous position with the Police Chief. Neither Gillespie nor Srinivasan offered to further assist Hemphill in returning to the Call Center. Believing she would lose her job altogether if she did not request a transfer to her previous position, Hemphill submitted the request as instructed.

The Personnel Department ultimately found no merit to Hemphill's hostile work environment complaint. When she was not awarded relief at the administrative level, Hemphill sued the City[2] under Title VII, claiming she was subjected to a racially hostile work environment in the Call Center, and that the City retaliated against her by compelling her to give up her supervisory position after she engaged in protected activity by filing a harassment complaint. See Compl., Hemphill v. City of Wilmington, No. 10-679 (D. Del. Aug. 12, 2010). I granted the City's request for summary judgment on Hemphill's hostile work environment claim, but permitted her retaliation claim to proceed to trial. See Mem. Op., Hemphill v. City of Wilmington, No. 10-679 (D. Del. Aug. 12, 2011).

After a three-day trial, the jury returned a verdict finding the City "retaliated against . . . Hemphill by forcing her to transfer from her supervisory position back to her position as administrative assistant to the Chief of Police in January 2008." Verdict Slip, Hemphill v. City of Wilmington, No. 10-679 (D. Del. Sept. 23, 2007) [hereinafter Verdict Slip]. The jury awarded no compensatory damages, id., but the equitable remedies of reinstatement, back pay, and other

---

[2]Hemphill also named the Mayor and Council of the City of Wilmington as defendants. For purposes of this Memorandum Opinion, references to the City are intended to encompass all three named defendants.

appropriate equitable relief were reserved for me to determine.  See Spencer v. Wal-Mart Stores, Inc., 469 F.3d 311, 316 (3d Cir. 2006).

Hemphill seeks "instatement"[3] to a merit position equivalent to her former supervisory position,[4] back pay in the amount of $17,376.47, prejudgment interest in the amount of $915.52, an order compelling the City to provide additional harassment and retaliation training for management-level employees, and an order requiring the City to post notice of the verdict.  See Pl.'s Post Trial Mot. Equitable Relief, Hemphill v. City of Wilmington, 10-679 (D. Del. Nov. 2, 2011) [hereinafter Pl.'s Mot.].  The City objects to each of these requests, but suggests no alternative means for making Hemphill whole, as Title VII requires.  See Defs.' Mem. P. & A. Resp. Pl.'s Mot. Equitable Relief, Hemphill v. City of Wilmington, No. 10-679 (D. Del. Dec. 2, 2011) [hereinafter Defs.' Resp.].

For the reasons that follow, the City's objections are meritless.

## II.   DISCUSSION

### A.   Legal Standard

"A chief remedial purpose of employment discrimination statutes . . . is 'to make persons whole for injuries suffered on account of unlawful employment discrimination.'"  Eshelman v. Agere Sys., Inc., 554 F.3d 426, 440 (3d Cir. 2009) (quoting Albemarle Paper Co. v. Moody, 422 U.S. 406, 418 (1975)).  Where a plaintiff has established her employer violated Title VII, "the [district] court has not merely the power but the duty to render a decree which will so far as

---

[3] For clarity, I will refer to this as "reinstatement to a merit position."

[4] In the alternative, she seeks $64,930 in front pay.  See Pl.'s Reply Mem. Supp. Pl.'s Mot. Post Trial Relief at 11, Hemphill v. City of Wilmington, No. 10-679 (D. Del. Dec. 12, 2011).

possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." Louisiana v. United States, 380 U.S. 145, 154 (1965); accord Albemarle Paper Co., 422 U.S. at 418.

"Congress armed the courts with broad equitable powers to effectuate this 'make whole' remedy." Eshelman, 554 F.3d at 440. "Discretion is vested . . . to allow the most complete achievement of the objectives of Title VII that is attainable under the facts and circumstances of [each] specific case." Franks v. Bowman Transp. Co., 424 U.S. 747, 770-71 (1976). Therefore, I have "wide discretion to 'locate a just result' regarding the parameters of the relief granted in the circumstances of [this] case." Eshelman, 554 F.3d at 440 (quoting Albemarle Paper Co., 422 U.S. at 424). In exercising that discretion, I must attempt "to restore [Hemphill] to the economic status quo that would exist but for the [City's] conduct." In re Continental Airlines, 125 F.3d 120, 135 (3d Cir. 1997); see Gunby v. Pa. Elec. Co., 840 F.2d 1108, 1110 (3d Cir. 1988) (a "Title VII verdict in [plaintiff's] favor require[s] a 'make whole' remedy").

Reinstatement, back pay, and prejudgment interest are widely accepted forms of equitable relief that may be available to successful Title VII plaintiffs. See 42 U.S.C. § 2000e-5(g)(1) (courts may "order such affirmative action as may be appropriate, which may include . . . reinstatement . . . with or without back pay . . . or any other equitable relief as the court deems appropriate"); Eshleman, 554 F.3d at 442 ("prejudgment interest on back pay awards" is "now-universal[ly] accept[ed]"); Spencer, 469 F.3d at 315 (court may award back pay); Feldman v. Phila. Hous. Auth., 43 F.3d 823, 831 (3d Cir. 1994) (reinstatement or front pay may be ordered, with reinstatement preferred unless animosity between the parties renders it infeasible); Bullen v. Chaffinch, 336 F. Supp. 2d 357, 358-59 (D. Del. 2004) (court may order "instatement," or "promotion to a position illegally denied").

There is a presumption in favor of back pay following a finding of employment discrimination. See Booker v. Taylor Milk Co., 64 F.3d 860, 864 (3d Cir. 1995). A Title VII plaintiff, however, is obligated to mitigate her damages by using "reasonable diligence to obtain substantially equivalent employment." Id. at 866 (emphasis omitted). Failure to mitigate damages does not "wholly cut off the right to any back pay"; rather, it may "reduce or decrease a back pay award." Id. (emphasis omitted). Although the duty to mitigate rests with the plaintiff, "the employer has the burden of proving a failure to mitigate" by demonstrating "that 1) substantially equivalent work was available, and 2) the Title VII claimant did not exercise reasonable diligence to obtain the employment." Id. at 864.

### B.    Reinstatement to a Merit Position

Hemphill concedes reinstatement to the CSS position is not a viable solution here for two reasons. See Pl.'s Mot. at 3-4. First, the trial established evidence of animosity between Hemphill and both her superiors and subordinates in that position. Id. Second, Hemphill has no desire to displace the person who is now the CSS. Id. Therefore, Hemphill asks me to fashion an alternative remedy, or "creative relief," akin to "instatement." Pl.'s Mot. at 2-6; see Bullen, 336 F. Supp. 2d at 362-63 (ordering "instatement" to "next available sergeant positions" where plaintiffs were not promoted previously due to racially discriminatory practices). For example, Hemphill requests that her current job as administrative assistant to the Police Chief be designated a "merit" position, and that she be compensated at the same level as the CSS, "for her tenure in that position." Pl.'s Mot. at 4-5.

The City opposes her request, noting a lack of precedent for such "creative relief," and calling the proposition "extreme" and "impractical" because "[i]t is a privilege of a department head to appoint his/her Administrative Assistant." Defs.' Resp. at 5. Additionally, the City

suggests Hemphill's concern that she will lose her current position when a new mayor is elected "is simply too speculative and not sufficient for this Court to regard her future termination as factual evidence." Id. at 8. The City's assertions, however, disregard the "make whole" aims of Title VII.

The jury found the City "forc[ed] [Hemphill] to transfer from her supervisory position back to her position as administrative assistant to the Chief of Police." Verdict Slip; see also Final Jury Instructions at Part II, p.4, Hemphill v. City of Wilmington, No. 10-679 (D. Del. Sept. 22, 2011) (requiring a finding that "a reasonable person in [Hemphill's] place would have felt compelled to seek a transfer back to her former position"). Therefore, the jury determined that, but for the City's retaliatory conduct, Hemphill would have remained in her supervisory position, with an increased salary, and without fear that each mayoral election might bring an end to her twenty-year career as a City employee.

The jury's verdict requires me to fashion a remedy that will "restore [Hemphill] as fully as possible to the position [s]he otherwise would have been in absent [retaliation]." Gunby, 840 F.2d at 1122. Accordingly, I will order her reinstated to a merit position with a salary equal to that which she would have earned as CSS. Although a new Chief of Police could choose to retain Hemphill as an administrative assistant, requiring her to wait until the next election to see whether she will lose her job would subject her to precisely the type of uncertainty she sought to avoid when she successfully sought a merit supervisory position.

The City can comply with this order in two ways. It must either: (a) designate Hemphill's current job a "merit" position for as long as she holds the position, and compensate her according to the level of pay associated with the CSS position; or (b) place Hemphill in a different "merit" position, compensated at the CSS level. If the City elects to proceed with

option "b," the alternate position offered to Hemphill must be agreeable to both parties.[5] This will eliminate any possibility Hemphill could be subject to further retaliation by being "promoted" to a less desirable position.[6]

### C. Back Pay and Prejudgment Interest

In addition to reinstatement to a merit position, Hemphill seeks $17,376.47 in back pay, representing the difference between her salary as CSS and her current salary, accruing from the time she transferred back to her current position through the time her petition for equitable relief was filed. See Pl.'s Mot. at 6-10. She also requests an award of prejudgment interest in the amount of $915.52, calculated using the federal short-term rate for November 2011, plus three percentage points, pursuant to 26 U.S.C. § 6621.[7]

The City argues Hemphill is not entitled to back pay because she failed to mitigate her damages.[8] Defs.' Resp. at 5-8. It notes Hemphill offered no evidence showing she "attempted to find substantially similar employment," except for "a single job application attached to her present application for equitable relief." Id. at 7; see Pl.'s Mot. at Ex. 5. The City points to a list

---

[5]Because I have ordered reinstatement to a merit position, Hemphill's alternative request for front pay is moot.

[6]For example, while the Personnel Department investigated her complaint, Hemphill was essentially stripped of her duties, given no temporary responsibilities, and provided with no suitable work space.

[7]Hemphill seeks interest for only three years of back pay, despite the fact her back pay award is for nearly four years (from January 2008 through December 2011), and she has not compounded the interest in her calculations.

[8]The City lodges no specific objections to the figures or methods Hemphill uses to calculate the amount of back pay and prejudgment interest she seeks. Accordingly, any such objections have been waived, and I will proceed based on the salary evidence submitted by Hemphill, as well as the method for calculating interest she proposes.

of more than 200 City job openings over the past four years, of which it claims about twenty were supervisory positions, and suggests the list is evidence of Hemphill's failure to mitigate. Defs.' Resp. at 7 & Ex. A.  I disagree.

First, there is no support for the City's suggestion that a plaintiff's failure to mitigate her damages renders her totally ineligible for an award of back pay.  Both Title VII and the cases interpreting it permit only a reduction in back pay if a plaintiff has failed to make reasonable efforts to seek substantially equivalent employment.  See 42 U.S.C. § 2000e-5(g) ("Interim earnings or amounts earnable with reasonable diligence . . . shall operate to reduce the back pay otherwise allowable."); Booker, 64 F.3d at 866 (failure to mitigate reduces, but does not eliminate, back pay).  Even if the City could demonstrate Hemphill failed to mitigate her damages, it could only succeed in reducing her back pay by deducting amounts she could have earned in some substantially equivalent position after such time as she reasonably should have obtained that position.

Second, the City must prove Hemphill's failure to mitigate.  Booker, 64 F.3d at 864 (employer must prove "substantially equivalent work was available," and plaintiff "did not exercise reasonable diligence to obtain the employment").  The only evidence the City has offered to satisfy its burden is a list "show[ing] that there were more than two (200) hundred [sic] positions available within the City of Wilmington from January 2008 until November 16, 2011." Defs.' Br. at 7.  The list contains four columns, none of which have headings identifying the type of information they contain.  See Defs.' Br. at Ex. A.  One column contains titles of the open positions, and two other columns list dates, one of which presumably reveals when the position was posted.  Id.  The list, however, does not convey whether the positions are "merit" or "appointed;" what job responsibilities are associated with the positions; what qualifications

applicants for the positions must have; how much the positions pay; or any other specific information that would permit a comparison of the open positions to the CSS position Hemphill previously held. Id.

Looking only at the job titles on the list, I can infer that numerous listed positions are either not equivalent to Hemphill's supervisory job or are positions for which she is not likely qualified. See, e.g., id. at Ex. A, p.1 (listing "school crossing guard," "water quality technician," "patrol officer," "general laborer I," "sanitation chucker," and "sewer management supervisor"). Such a list is hardly probative. See Caufield v. Ctr. Area Sch. Dist., 133 F. App'x 4, 11 (3d Cir. 2005) (affidavits from school officials in other districts noting open elementary teaching positions were "insufficient evidence to carry [employer's] burden" where they did "not indicate whether those positions were of substantial equivalence to" the teaching position plaintiff was denied); cf. Booker, 64 F.3d at 864-65 (copies of job listings from local newspaper over relevant time period were sufficient to show failure to mitigate where plaintiff was an unskilled laborer and ads contained enough information to compare job openings to his prior duties). Moreover, unlike the plaintiffs in many "failure to mitigate" cases, Hemphill continued working during the entire relevant period, thereby limiting her back pay claim to only a fraction of her yearly salary. Cf. Booker, 64 F.3d at 865 (finding an unemployed plaintiff who submitted no job applications during the relevant time period had not "demonstrat[ed] a continuing commitment to be a member of the work force").

Under these circumstances, the City has not established Hemphill failed to mitigate her damages. Hemphill is entitled to an award of back pay with prejudgment interest. See Eshleman, 554 F.3d at 442; Spencer, 469 F.3d at 315. Hemphill has adduced uncontested evidence showing her current salary is $44,158, and the salary she would be earning as CSS is

$49,367.[9] Pl.'s Mot. at Ex. B. The difference in salary, therefore, is $5,209 per year, or $434.08 per month. Hemphill has been earning the reduced salary since her transfer in January 2008, i.e., for three years and eleven months. Therefore, she is entitled to back pay of $20,401.88, and $997.00 in prejudgment interest.[10]

### D. Other Relief

Hemphill seeks two forms of additional equitable relief: enhanced training of management-level employees for harassment complaints; and a public posting of the jury verdict. See Pl.'s Mot. at 11-14. The first request is based on the jury's finding that Hemphill's managers failed to abide by the law in responding to her hostile work environment complaint. Id. at 11-13. The second is based on Hemphill's averment that City employees -- including members of the Law Department -- have claimed the City, not Hemphill, prevailed at trial in this matter. Id. at 13-14, Ex. B.

Once again, the City objects to Hemphill's requests, suggesting she will not benefit from such measures. Defs.' Resp. at 9. First, the City points to its existing training programs and harassment policy, arguing they render Hemphill's first request "moot." Id. Second, the City claims a posting stating "the City was found guilty of retaliation" would be misleading, because Hemphill was awarded no compensatory damages. Id.

---

[9] These figures, which are taken from Hemphill's affidavit and are not disputed by the City, differ from those used by counsel in Hemphill's motion. Compare Pl.'s Mot. at Ex. B, with id. at 9. I have revised the back pay and prejudgment interest calculations using the figures from the affidavit, and added compensation for November and December 2011.

[10] $20,401.88 is 3 times $5,209, plus 11 times $434.08. I calculated the prejudgment interest using the method set forth by Hemphill, see Pl.'s Mot. at 11, and uncontested by the City, but substituting my corrected yearly wage loss figure ($5,209) for the erroneous figure used in her brief. Because she seeks interest for only three years of back pay, the calculation does not include the remaining eleven months. Id.

I disagree. Hemphill remains an employee of the City and wishes to continue to work for the City for the foreseeable future. As such, she stands to benefit from enhanced training of City managers, and she has an interest in the dissemination of accurate information about the outcome of this litigation.[11] Although the evidence at trial demonstrated the City has a harassment policy -- on which it trains employees and managers, including those who played a central role in this case -- the jury's finding that the City retaliated against Hemphill because she complained of a hostile work environment evidences that, at least in this instance, the City's policies and training programs apparently failed.

To remedy these failures, I will exercise my broad discretion to fashion appropriate relief and require the City to hire an independent, third-party vendor (such as a law firm or consultant) to conduct annual supplemental training in 2012 and 2013 of all management-level employees in the Department of Public Works and the Personnel Department regarding how to properly respond to complaints of workplace harassment. See Heller v. Elizabeth Forward Sch. Dist., 182 F. App'x 91, 96 (3d Cir. 2006) (courts have "discretion to fashion equitable relief to effectuate the purposes of the Title VII statutory scheme"); Hare v. Potter, 549 F. Supp. 2d 688, 698 (E.D. Pa. 2007) (jury's Title VII retaliation verdict "identified a serious deficiency at some levels of defendant's management," and justified court-ordered supplemental training). The vendor must be selected within sixty days with input from Hemphill's counsel, and approved by me.

Finally, I direct the City to publish the verdict in this case. See Hare, 549 F. Supp. at 698. To ensure Hemphill suffers no further harassment or retaliation for engaging in protected activity, the City must post a complete and accurate description of the outcome of this litigation,

---

[11] I need not resolve whether City employees have misrepresented the verdict because Hemphill is a "prevailing party" in this litigation.

including the jury's finding that the City retaliated against Hemphill, its award of no compensatory damages, and a description of the equitable relief I have awarded. The City must post this information in all places where statutory notices pursuant to Title VII are typically posted.

        E.       **Fees and Costs**

As the "prevailing party," Hemphill is entitled to recover reasonable attorneys' fees and costs arising from this litigation. See 42 U.S.C. § 1988; Hensley v. Eckerhart, 461 U.S. 424, 429 (1983). Ideally, the parties should confer with one another and "settle the amount of a fee," rather than engaging "in a second major litigation." Hensley, 461 U.S. at 437. Should settlement fail, Hemphill shall file a petition pursuant to § 1988 and Federal Rule of Civil Procedure 54(d) seeking reasonable attorneys' fees and costs within thirty days of the docketing of this Opinion. The City shall file any objections to the petition within fourteen days of its docketing.

An appropriate order follows.